829 A.2d 297

KEYSTONE AERIAL SURVEYS, INC.

v.

PENNSYLVANIA PROPERTY & CASUALTY INSURANCE GUARANTY ASSOCIATION

Appeal of Pennsylvania Property & Casualty Insurance Guaranty Association

Keystone Aerial Surveys, Inc.,

v.

Pennsylvania Property & Casualty Insurance Guaranty Association

v.

Marisol Campbell, Vanessa Campbell and Melva Campbell, Individually and As Natural Mother and Next Friend of Penelope Campbell and Nakita Campbell, Minors.

Appeal of Pennsylvania Property & Casualty Insurance Guaranty Association.

Supreme Court of Pennsylvania.

Argued Oct. 21, 2002.

Decided July 23, 2003.

Lise Luborsky, Philadelphia, for Pennsylvania Property & Casualty Insurance Guaranty Association, appellant.

John Kerry Weston, Philadelphia, for Keystone Aerial Surveys, Inc., appellee.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, and SAYLOR, JJ.

## OPINION

Justice SAYLOR.

This appeal requires an evaluation of the $300,000 "per claimant" limitation embodied in the Pennsylvania Property and Casualty Insurance Guaranty Association Act.

In May of 1994, Thomas Campbell, a resident of Texas, was killed in Nevada in the crash of an airplane owned and operated by Appellee Keystone Aerial Surveys ("Keystone"), a Pennsylvania corporation. Mr. Campbell's wife and four surviving children (also Texas residents) commenced a civil action against Keystone in the United States District Court for the Southern District of Texas, advancing claims predicated on, *inter alia*, theories of wrongful death and survival under Texas law.

Keystone maintained a policy of insurance with American Eagle Insurance Company ("American Eagle"), covering accidental harm to aircraft and passengers. Pursuant to the terms of the policy, American Eagle assumed Keystone's defense in the litigation initiated by the Campbells; however, in December of 1997, the insurer was deemed insolvent and placed in liquidation via orders of a Texas county court. By virtue of Keystone's status as a Pennsylvania corporation and as American Eagle's insured, the insolvency triggered certain statutory obligations on the part of the Pennsylvania Property and Casualty Insurance Guaranty Association ("PPCIGA" or the "Association") pursuant to the Pennsylvania Property and Casualty Insurance Guaranty Association Act.[1] In particular, PPCIGA assumed Keystone's defense of the Campbells'

1. Act of December 12, 1994, P.L. 1005, No. 137 § 1 (as amended, 40 P.S. §§ 991.1801–991.1820) (the "PPCIGA Act"). This legislation superseded the former Pennsylvania Insurance Guaranty Association Act, Act. of Nov. 25, 1970, P.L. 716, No. 232 (as amended 40 P.S.

claims, *see* 40 P.S. § 991.1803(b)(1)(i), (2), and became obligated to pay "covered claims" existing prior to the determination of the insolvency, *see* 40 P.S. § 991.1803(b)(1), subject to certain conditions and limitations. *See generally Bell v. Slezak*, 571 Pa. 333, 341, 812 A.2d 566, 570–71 (2002) (describing the overall operation of the PPCIGA Act). The limitation presently in issue prescribes that the Association's obligations shall be satisfied by paying an amount not exceeding $300,000 "per claimant" for claims other than those relating to return of unearned premiums. *See* 40 P.S. § 991.1803(b)(1)(i)(B).[2]

Keystone and the Association apparently reached an impasse concerning the extent of PPCIGA's potential monetary obligations, *inter alia*, in light of the statutory, $300,000 "per claimant" limitation. The Association took the position that only Mr. Campbell or his personal representative was a claimant under the PPCIGA Act, thus limiting its potential liability to $300,000; Keystone, on the other hand, maintained that each of the Campbells was a proper claimant, thereby increasing the Association's potential liability to 1.5 million dollars ($300,000 for each of the five surviving Campbells). Ultimately, Keystone settled the Texas action by committing to pay 1.5 million dollars, in exchange for release from liability on the underlying claims, with $300,000 of the settlement fund allocated to each of the surviving Campbells, as reflected in a final judgment to which the settlement was reduced.[3] Keystone

§§ 1701.101–1701.605), which was the enabling legislation for PPCIGA's predecessor, the Pennsylvania Insurance Guaranty Association.

2. Section 1803(b), 40 P.S. § 991.1803, states, in relevant part:
(b) [PPCIGA] shall have the following powers and duties:
(1)(i) To be obligated to pay covered claims existing prior [to] the determination of the insolvency.... Any obligation of the association to defend an insured shall cease upon the association's payment or tender of an amount equal to the lesser of the association's covered claim obligation or the applicable policy limit. Such obligation shall be satisfied by paying to the claimant an amount as follows:
* * *
(B) An amount not exceeding three hundred thousand ($300,000) dollars per claimant for all other covered claims.
40 P.S. § 991.1803(b)(1)(i).

3. The record is vague concerning the timing and scope of the discussions between Keystone and PPCIGA; however, the final judgment

also agreed to cooperate with the Campbells in determining the amount of insurance coverage available from PPCIGA.

Keystone then commenced the present declaratory judgment action against PPCIGA in the common pleas court, seeking an order requiring that each of the Campbells be deemed a separate claimant for purposes of the PPCIGA Act, and that the Association therefore be required to fully fund the 1.5 million dollar settlement. The Campbells sought and obtained leave to intervene as co-plaintiffs. PPCIGA filed an answer and, subsequently, the parties filed cross motions for summary judgment.

In granting summary judgment in favor of PPCIGA, the common pleas court acknowledged that, under Texas law, each of the Campbells was entitled to pursue a discrete, direct cause of action arising out of Mr. Campbell's death. The court nonetheless contrasted Pennsylvania law, pursuant to which an action for wrongful death is maintained by a personal representative on behalf of survivors, *see* 42 Pa.C.S. § 8301, *see also* Pa.R.Civ.P. No. 2202, leaving the individual wrongful death beneficiaries with solely derivative, but not independent, causes of action. *See generally Tulewicz v. SEPTA*, 529 Pa. 588, 597 n. 9, 606 A.2d 427, 431 n. 9 (1992). Since it concluded that, had the action arisen in Pennsylvania, PPCIGA's liability would have been limited to $300,000, the court was disinclined to afford greater recovery on claims accruing in Texas, thus effectively discriminating against those whose claims arise locally. Additionally, the common pleas court observed that the more constrained interpretation of the statutory limitation had a salutary effect in the administration of PPCIGA assets. *See Keystone Aerial Surveys, Inc. v. PPCIGA,* No. 1484, *slip op.* at 4 (C.P.Phila.Sep.14, 2000) ("Public policy demands that we both maintain . . . consistency [in the treatment of in-state and out-of-state claimants], and that we support the PPCIGA statute's intent to conserve the funds so that all aggrieved

against Keystone entered by the Texas district court reflects that "[a]s a result of [PPCIGA]'s failure to recognize policy limits of $1,500,000 and their failure to settle the case for policy limits, Keystone was forced to enter into the settlement to protect its assets."

insureds may have a source of coverage to which they may turn."). Reading the PPCIGA Act's limitation in light of the Pennsylvania wrongful death statute, the common pleas court thus agreed with the Association that the PPCIGA Act recognizes only a single claim for wrongful death of a person, regardless of the number of potential wrongful death beneficiaries.

The common pleas court found further support for its conclusion in this Court's treatment of a statutory, $250,000 "per plaintiff" limitation applicable to certain verdicts against the Commonwealth embodied in Act 1978–152, P.L. 788, 42 Pa.C.S. § 5111 (repealed). *See Keystone,* No. 1484, *slip op.* at 3–4 (citing *Tulewicz,* 529 Pa. at 595, 606 A.2d at 430). The court noted that, in *Tulewicz,* this Court determined that Act 1978–152's limitation applied to the aggregate wrongful death and survival claims brought by the single personal representative on behalf of both the estate and the survivors. *See id.* at 597 n. 9, 606 A.2d at 431 n. 9. Finally, the common pleas court indicated that its interpretation was consistent with that taken by the appellate courts in the motor vehicle coverage context, holding that distinct claims of related parties are not aggregated under a coverage limit, while purely derivative claims are so aggregated. *See Anthem Cas. Ins. Co. v. Miller,* 729 A.2d 1227 (Pa.Super.1999); *Erie Ins. Group v. Shue,* 741 A.2d 803 (Pa.Super.1999).

On appeal, the Superior Court reversed in an opinion authored by Judge Lally–Green. *See Keystone Aerial Surveys, Inc. v. PPCIGA,* 777 A.2d 84 (Pa.Super.2001). Applying principles of statutory construction and referencing prior decisional law, the court determined that the term "claimant" under the Act includes third parties whose injuries would have been covered under the policy between the insured and the insolvent insurer. *See id.* at 92. The Superior Court also considered the problem identified by the common pleas court, namely, that differences arising out of the choice of forum may affect the entitlement to assert a direct claim against an insurer in wrongful death/survival proceedings. The court reasoned, however, that the relevant inquiry should center

primarily on the scope of the contractual terms of the insurance policy, not on the cause of action or the jurisdiction in which the action is asserted. *See id.* at 93. In this regard, the court explained:

> Depending on the state in which the action is processed and the specific cause of action asserted, a person could be considered a plaintiff with his or her own cause of action, or a mere beneficiary of a cause of action asserted by another person. Nothing in the Act, however, intimates that the manner in which an action is processed in a state court affects a person's status as a "claimant." Indeed, a third party victim may, in certain cases, assert a claim against the insured without ever filing a formal lawsuit.

*Keystone,* 777 A.2d at 93. The Superior Court deemed the *Tulewicz* decision, cited by the common pleas court, distinguishable, since Act 1978–152's limitation functioned as a "per plaintiff" cap, in contrast to the PPCIGA Act's approach of limiting the Association's obligations "per claimant." *See Keystone,* 777 A.2d at 93–94. The court also observed that the purposes of Act 1978–152 differed substantially from those of the PPCIGA Act: whereas the former concerned limitations on damages in actions against the Commonwealth, the PPCIGA Act is designed to protect claimants and policyholders, and not for the guiding purpose of limiting recovery. *See Keystone,* 777 A.2d at 94.

Finally, the Superior Court declined PPCIGA's invitation to undertake a choice-of-law assessment to determine whether Pennsylvania, as opposed to Texas, law governed resolution of the controversy. Because, under the above analysis, resolution of the question of who is a claimant depends primarily on issues of contract interpretation and not on where or how such claims are asserted in an adjudicatory setting, it was not clear to the court that a true conflict between state laws at issue in the case persisted. *See id.* Since the parties had not specifically addressed the question of whether the Campbells' claims were within the contemplation of the American Eagle policy, the court remanded for further proceedings, directing the common pleas court, *inter alia,* to determine the number of

claimants and covered claims. Further, the Superior Court expressly refrained from restraining the common pleas court from applying choice-of-law principles in the course of its examination of the policy terms. *See id.* at 94–95 n. 15.

After the Superior Court rendered its decision in the present appeal, this Court issued *Bell,* 571 Pa. at 333, 812 A.2d at 566. There, in the course of considering the application of the PPCIGA Act's non-duplication of recovery provision, *see* 40 P.S. § 991.1817(a), the Court addressed foundational questions concerning the workings of the insurance guaranty association statute and the role of the Association. As a threshold matter, the Court recognized that the statutory scheme is designed to ameliorate losses to insureds and third-party claimants resulting from the insolvency of a member insurer. *See Bell,* 571 Pa. at 341, 812 A.2d at 570–71. The Court proceeded to consider whether first and/or third-party claims fit within the statutory definition of the term "covered claim," which proceeds, *inter alia,* as follows:

> (1) An unpaid claim, including one for unearned premiums, submitted by a claimant, which arises out of and is within the coverages and is subject to the applicable limits of an insurance policy to which this article applies issued by an insurer if such insurer becomes an insolvent insurer after the effective date of this article. . . .

40 P.S. § 991.1802.[4]

In determining that not only first but also third-party claims constituted "covered claims," the Court reasoned that the PPCIGA Act makes express reference to third-party claims, and that the cognizance of such claims is consistent with the broad, statutory definition and the remedial purposes of the legislation. *See Bell,* 571 Pa. at 344, 812 A.2d at 572. Responding to a dissenting position emphasizing the role of potential defenses to third-party claims available to the Association under the statutory scheme via its incorporation of state insurance law precepts, *see* 40 P.S. § 991.1803(b)(2), the

4. The statute also requires that the claimant or insured be a Commonwealth resident at the time of the insured event, or the property from which the claim arises be permanently located in the Commonwealth. *See* 40 P.S. § 881.1802 (definition of "covered claim").

Court determined that "the PPCIGA Act specifically provides the statutory basis for third-party beneficiary claims ... as the Act specifically contemplates third-party beneficiaries as claimants thereunder." *Id.* at 345, 812 A.2d at 573.

*Bell* thus defined the term "claimant" as one who possesses a "covered claim" under the PPCIGA Act, and read those terms as detached from whether or not a direct right of action existed in favor of the claimant and against the insolvent insurer under state law. Further, the decision implemented a broad understanding of the character and effect of the "aris[ing] out of and ... within the coverages" phrase of the statutory language defining "covered claims." 40 P.S. § 991.1802. This comports with Superior Court's reasoning in the present case to the effect that the manner in which an action is processed in a state court does not affect a person's status as a claimant under the PPCIGA Act. *Compare Bell,* 571 Pa. at 344, 812 A.2d at 572, *with Keystone,* 777 A.2d at 93. Further, it is generally consistent with one branch of divided lines of authority prevailing in other jurisdictions.[5] We also agree with, and adopt, the Superior Court's stated basis for distinguishing *Tulewicz, see Keystone,* 777 A.2d at 93–94; *see also supra.* Finally, we observe that the automobile coverage cases cited by the common pleas court, *see Anthem Cas.,* 729 A.2d at 1227; *Erie Ins.,* 741 A.2d at 803, address internal, policy coverage limitations as distinguished from PPCIGA's unique, statutory cap, and therefore, are relevant, if at all, solely to the common pleas court's task on remand to assess any relevant, scope-of-coverage limitations embodied in the American Eagle policy.

■ We hold that the Superior Court correctly determined that each of the five Campbells is a proper claimant for purposes of the Act, so long as it can fairly be said that their claims arise out of and are within the coverage provided by

5. *Compare, e.g., West Virginia Ins. Guaranty Ass'n v. Potts,* 209 W.Va. 682, 550 S.E.2d 660, 665–66 (W.Va.2001); *Oglesby v. Liberty Mutual Ins. Co.,* 832 P.2d 834, 840–41 (Okla.1992), *with Builders Transport v. S.C. Prop. & Cas.,* 307 S.C. 398, 415 S.E.2d 419, 423 (S.C.1992); *Florida Ins. Guaranty Ass'n v. Cole,* 573 So.2d 868, 870–71 (Fla.App. 1990).

the American Eagle policy, and the common pleas court's award of summary judgment in favor of the Association was properly reversed.

Although we have answered the question presently before the Court, Mr. Justice Castille's dissenting opinion merits response. The dissent opines that Texas law does not permit multiple claimants in wrongful death actions, and, for this reason, under any theory all of the Campbells' claims must be considered a single, aggregate, derivative claim. Dissenting Opinion, *Op.* at 305. The dissent then posits that the language of any liability insurance policy would command the same conclusion, offering an example of an automobile insurance policy with a $15,000 per individual and $30,000 per occurrence limit, and indicating that the insurance company's exposure on wrongful death claims in such circumstances could not exceed the $15,000 limit. *See id.* at 306. Further, the dissent contends that the language of the underlying insurance policy should not control whether a person is a "claimant" for purposes of the PPCIGA Act and suggests that our interpretation compromises the enactment's salutary aims. *See id.* at 307.

In response, as a preliminary matter, liability insurance policies tend to be highly individualized and the associated decisional law is specialized and technical; therefore, broad generalizations of the sort offered in the dissenting opinion are likely to be misleading. For example, the aircraft liability portion of the policy in this case contained only an occurrence-based limitation of $5,000,000—there simply is no "per passenger" (or "per person" or "per individual") limitation as the dissenting opinion suggests there must be. *See* American Eagle Insurance Company Aircraft Insurance Policy, Coverage Identification Page 2 ("Passenger sub-limit ... N/A"). Additionally, since the aggregate settlement in this case is well beneath the $5,000,000 figure, the policy limits simply do not, in and of themselves, function as a cap in the manner that the dissenting opinion also claims they must.[6]

6. We do not suggest that there may not be other forms of limitations, definitional or otherwise, which may be discerned in the process of

■ Furthermore, in providing its assessment of the term "claimant" under Texas law, the dissent misconstrues our holding. We have not conditioned status as a claimant under the PPCIGA Act on particular state law definitions of the term "claimant." Rather, we have adopted the Superior Court's view that this term, as used in Section 991.1803(b)(1)(B) of the Act, means one possessed with a "covered claim," subsuming, *inter alia*, losses occasioned to third parties caused by the insured, and for which the insured would be entitled to recompense from its insurer, but for the insurer insolvency. *See Keystone*, 777 A.2d at 92. As Judge Lally–Green explained, the potential for choice-of-law questions arises in connection with the interpretation of the insurance policy terms to determine whether the insurer would have been required to fund liability on the individual harm asserted, not with respect to construction of the terms "covered claim" and "claimant" set forth in the PPCIGA Act. *See Keystone*, 777 A.2d at 92–93.[7] The dissent does not dispute that damages in a Texas wrongful death action are determined based on the individual losses of each of the beneficiaries. *See generally* 77 Tex. Jur.3d Wrongful Death § 9 (2003). The only remaining issue, then (assuming relevance of Texas law on the preceding question), is whether, and to what extent, the American Eagle policy insured Keystone against this form of consequential damages. *See generally* 44 Am.Jur.2d Insurance § 1557 (2002).

Respecting the dissent's assertion that the language of the underlying policy should not affect who is possessed with a covered claim, as we have indicated, this issue was resolved

construing the policy at issue. Other than the response to the dissent, our focus here has been on answering the question presented in the case, namely, whether summary judgment was properly entered on the reasons offered by the common pleas court.

7. As an aside, however, it is interesting to note that, in holding that a statutory "per person" limitation upon wrongful death claims against governmental units referred to the person injured as opposed to the derivative beneficiaries, the Texas Supreme Court expressly distinguished its legislature's use of the term "per person" from the broader, "per claimant" formulation, the latter of which the court employed when referring to the beneficiaries. *See City of Austin v. Cooksey*, 570 S.W.2d 386, 388 (Tex.1978).

contra to the dissent's position in *Bell v. Slezak,* 571 Pa. at 333, 812 A.2d at 566. *Bell* expressly held that third-party plaintiffs holding judgments against an insured (or who are obligees under a binding settlement agreement) are claimants under the PPCIGA Act, *see id.* at 344, 812 A.2d at 572–73. The suggestion that the Act creates tiers of such third-party claimants is unsupported by the terms of the PPCIGA Act— nothing in the enactment indicates that those possessed with derivative claims are any less "claimants" than those possessed with direct claims. Moreover, the dissent's indication that our interpretation effectively eliminates the statutory cap on recovery, *see* Dissenting Opinion, *Op.* at 305, is overstatement, since the cap by its terms functions in all instances in which an individual covered claim exceeds $300,000.

Finally, with regard to the dissent's policy discussion, we recognize that there are mixed considerations involved. The dissenting opinion, on the other hand, gives little account for the substantial adverse effect its interpretation would impose on claimants as well as policyholders (whose financial interests the statute expressly seeks to protect) as it proceeds afield from the expressed provisions of the Act. *Accord Oglesby,* 832 P.2d at 840 ("A finding that only one claim may arise out of a single occurrence would largely defeat the remedial purpose of the [state guaranty association enactment]—to protect claimants and policyholders from financial losses associated with the insolvency of an insurance company."); *Potts,* 550 S.E.2d at 665–66 (same). While it may well be that adjustments by the General Assembly to the PPCIGA scheme will at some point be necessary in order to maintain its fiscal integrity, it exceeds our role to infer that the Legislature intended to include an occurrence-based limitation in a statute which, on its terms, lacks one. *Accord Oglesby,* 832 P.2d at 840 ("There is no basis for substituting the word 'occurrence' for 'claim' in order to aggregate multiple claims arising from a single accident."); *Potts,* 550 S.E.2d at 665–66 (same).

The order of the Superior Court is affirmed.

Justice EAKIN did not participate in the consideration or decision of this case.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

Justice CASTILLE files a dissenting opinion.

Justice CASTILLE, dissenting.

I disagree with the Majority's conclusion that each of the five surviving members of decedent Thomas Campbell's immediate family is a separate claimant for purposes of determining the obligation and exposure of the Pennsylvania Property and Casualty Insurance Guaranty Association ("PPCIGA" or "Association"), so long as their derivative claims may fairly be said to arise out of and fall within the scope of coverage provided by the defunct insurer, American Eagle Insurance Company. Therefore, I respectfully dissent.

The PPCIGA Act provides that the Association is obligated to pay covered claims arising out of the insolvency of insurers authorized to write property and casualty insurance policies in Pennsylvania, subject to certain limitations. 40 P.S. § 991.1803. The pertinent limitation in this appeal provides that the Association's obligation is met when it pays "an amount not exceeding three hundred thousand ($300,000) dollars per claimant" for all claims other than those involving unearned premiums. *Id.* The question germane to this appeal is whether the General Assembly intended that when family survivors litigate a wrongful death action deriving from the death of an insured single decedent, the number of statutory claimants and the amount of the Association's exposure should increase according to the number of survivors; or, did the Assembly intend that the single decedent through whom the survivors litigate determines the number of claimants?

The Majority agrees with the Superior Court that the appropriate definition of "claimant" should depend upon the language of the underlying insurance policy with the insolvent insurer and, therefore, the Association's exposure may vary. I cannot accept the Majority's approach, since it permits the

language of the underlying insurance policy to displace the governing statute thereby effectively eliminating the statutory "cap" on recovery.

Preliminarily, I note that both the Superior Court and the Common Pleas Court assumed that Texas law allows multiple claimants in wrongful death actions. *See* Super. Ct. slip op. at 3 n. 3 and 19 n. 13; trial court slip op. at 3. That is not how I read the admittedly scant authorities provided this Court on that question. Section 71.004 of the Texas wrongful death statute, Tex. Civ. Prac. & Rem.Code § 71.004, lists the beneficiaries of a wrongful death action and who may file that action under the statute:

(a) An action to recover damages as provided by this subchapter is for the exclusive benefit of the surviving spouse, children, and parents of the deceased.

(b) The surviving spouse, children, and parents of the deceased may bring the action *or one or more of those individuals may bring the action for the benefit of all.*

(c) If none of the individuals entitled to bring an action have begun the action within three calendar months after the death of the injured individual, his executor or administrator shall bring and prosecute the action unless requested not to by all those individuals.

*Id.* (emphasis supplied). Thus, although the statute recognizes multiple potential beneficiaries, it speaks of a single wrongful death action. Moreover, Section 71.003 of the Code limits when such an action may be filed: "This subchapter applies only if the individual injured would have been entitled to bring an action for the injury if he had lived." Tex. Civ. Prac. & Rem.Code § 71.003. The Texas Court of Appeals has recognized that the statutory language demonstrates the derivative nature of a wrongful death claim: "the Wrongful Death Statute and Survival Statute expressly state that any action brought under either are derivative of the decedent's rights." *Zacharie v. U.S. Natural Resources, Inc.,* 94 S.W.3d 748, 757–58 (Tex.Ct.App.2002). Accordingly, while the Campbells are all potential beneficiaries under the Texas wrongful death statute, their "claim" (here brought by one for the

benefit of all) is a single claim derivative of the decedent's claim. Thus, Texas law, no less than Pennsylvania law, apparently recognizes that a single decedent cannot be the source of multiple, derivate wrongful death "claims." [1]

The very nature of insurance policies also commands a finding of a single claimant here. Insurance policies of all types, be they automobile, commercial or general liability policies, designate limits of exposure. These limits on liability are typically stated in terms of the limit per claimant and per occurrence. For example, an automobile insurance policy may limit liability to $15,000 per individual claimant and $30,000 per occurrence. If the insured on that automobile policy is involved in an accident where a third party is fatally injured, the third party's estate would recover the $15,000 policy limit per individual, regardless of the number of dependents/heirs/beneficiaries the third party decedent left. The fortuity that the decedent left four heirs would not increase the insurer's exposure fourfold to $60,000. The exposure, in every case, would properly be the policy limit of $15,000 because the true claimant against the policy is the decedent, not the arbitrary and unpredictable number of heirs or survivors who try to squeeze into his single pair of shoes. The survivors' right of recovery is capped by their decedent's right; and the insurer's limit of exposure is commensurately ascertainable and assured.[2]

1. The Majority misapprehends the purpose of my "preliminary" discussion of Texas law, which was occasioned only because I believe that the parties misunderstood it. I do not suggest that Texas law controls the number of PPCIGA claimants in this case or that Texas law defines PPCIGA exposure. I simply note the tangential point that, in fact, my understanding of the PPCIGA Act does not create a conflict with Texas law.

2. The Majority also misconstrues the purpose of my discussion of these general insurance principles. I agree with the Majority that the question in the case *sub judice* is one of statutory interpretation of the PPCIGA Act regarding what is a claim or claimant. Unlike the Majority, I conclude that the statute intends to limit PPCIGA's exposure to one claim where would-be multiple claimants seek relief as survivors of a single, actual injured or deceased individual. Thus, my discussion of general insurance principles is not meant as a guidepost to explicating the American Eagle policy, but rather is offered to further explain what

Insurance policies containing policy limits typically function in the same manner. The policy limit sets the absolute limit of liability; the unpredictable number of dependents, heirs or beneficiaries a deceased claimant leaves behind does not arbitrarily multiply the exposure. Insurance policies are deliberately structured with foreseeable limits in order to provide insurers with a basis upon which to calculate their risk, *i.e.*, the amount they will need to pay covered claims. To inject an unknowable and, indeed, exponential variable such as the number of beneficiaries or dependents of an injured person would skew actuarial computations and potentially leave insurers with insufficient funds with which to pay claims, resulting in the prospect of insurer insolvency.[3]

The Association acts like an emergency limited insurer and in fact steps into the shoes of an insolvent insurer, subject to the statutory provisions limiting the Association's obligations and financial exposure. Those provisions set a cap on the amount recoverable per claimant, a cap that is tantamount to an insurer's limit of liability. Here, the now-insolvent insurer, American Eagle, insured Keystone Aerial Surveys under a policy covering accidental harm to aircraft and passengers. Thomas Campbell was tragically killed when an airplane owned by Keystone crashed with him aboard. But, that single decedent, and not his surviving wife or their four children, was a passenger in the doomed aircraft. Had the decedent survived with injury he would have had a single claim against the insurer; the circumstance of his demise, while tragic, does not change the nature of that unitary claim. Rather, common sense and standard insurance practices should dictate that he is the true claimant for purposes of the Act and that the

I believe the General Assembly intended when it defined the exposure of PPCIGA.

3. I agree with the Majority that this case involves third party claimants. The derivative, survivor claim here is, by definition, a third party claim. I simply disagree with the Majority's conclusion that that third party claim multiplies exponentially merely because, by happenstance, there are multiple survivors to step into the single pair of shoes left by the true third party claimant, here the deceased.

claims of his family survivors are merely derivative of the single insured claim arising out of the plane crash.[4]

In the same way that policy limits provide insurers with some measure of control over the amount paid for claims and, therefore, an ability to tailor appropriate premiums commensurate with the risk involved, the statutory cap on the Association's obligations is essential. The cap helps ensure that the amount the Association will pay out in a given year will not exceed the tightly-controlled amounts paid into it by insurers writing policies in Pennsylvania. The Association is funded by assessments against solvent insurers. The Association calculates the total amount needed to meet its obligations and then assesses each solvent insurer its share of that total "in the proportion that the net direct written premiums of the member insurer for the preceding calendar year ... bears to the aggregate net direct written premiums of all member insurers for the preceding calendar year." 40 P.S. § 991.1808(b). The maximum assessment against any solvent insurer, however, is limited: no insurer can be assessed "an amount greater than two per centum (2%) of that member insurer's net direct written premiums for the preceding calendar year." *Id.* § 991.1808(d). Due to the statutorily limited resources available to the Association, the statutory cap is absolutely essential to maintaining the integrity of the Association and its ability to pay claimants at least some recovery on covered claims from insolvent insurers.

Unlike the Majority, I would not leave the question of the meaning of the statutory term claimant to the vagaries of various states' intestacy laws lest the Association itself become insolvent. Indeed, given the function of the Association, and its financial structure, I believe a reading of the statute that would define the word claimant to permit multiple survivors of

4. In all likelihood, due to the nature of liability insurance policies and limits on liability contained therein, the remand ordered by the Superior Court and affirmed by a majority of this Court will result in a finding that the decedent was, indeed, the sole claimant under the language of the American Eagle policy. But, that does not alter the impracticality of the analytical paradigm approved by the Majority.

a single tort victim separate recoveries against the Association is both unreasonable and antithetical to the purpose of the Association. Pennsylvania law pertaining to wrongful death actions permits only the personal representative of a decedent to file a wrongful death action on behalf of the decedent's beneficiaries. *See* Pa.R.C.P. 2201(a); *Tulewicz v. Southeastern Pennsylvania Transp. Auth.*, 529 Pa. 588, 606 A.2d 427, 431 n. 9 (Pa.1992) (separate damage caps do not apply to each beneficiary because Rule 2201 "clearly provides that it is only the personal representative of the decedent who may maintain an action for wrongful death for the benefit of those persons entitled by law to recover damages for such wrongful death."). This principle, while not directly applicable here, provides support for the conclusion that the term "claimant" as used in the Act means the individual actually injured in the course of the covered event, and not that individual's survivors, who step into his single pair of shoes.

Here, the surviving members of the Campbell family have no claims for injury to themselves against the insolvent insurer. Rather, their claims devolve from the single decedent's claim for injury, which became his estate's claim upon his death. Thus, I would hold that the enumerated members of the Campbell family, through their decedent's estate, comprise a single claimant for purposes of the Act. Accordingly, I would reverse the Superior Court and affirm the trial court's grant of summary judgment in favor of the Association. Because the Majority does otherwise, I respectfully dissent.